IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
EASTERN DIVISION

| | |
|---|---|
| David A. Blasi and Paula J. Blasi, as trustees of the Blasi Living Trust, on behalf of themselves and a class of similarly situated persons,<br><br>Plaintiffs,<br><br>v.<br><br>Kraken Development III, LLC and Kraken Operating, LLC,<br><br>Defendants. | Case No. 3:20-cv-00092-ARS |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

[¶1]   Defendants Kraken Development III LLC and Kraken Operating LLC (collectively "Kraken") submit this Memorandum in Support of the Motion to Dismiss.

### INTRODUCTION

[¶2]   Plaintiff's complaint fails to state a claim. The plain language of the oil royalty clause is unambiguous and, on its face, precludes Plaintiff's claim. Versions of this royalty clause have been used in oil and gas leases for the last hundred years, and courts and commentators alike have consistently interpreted it to foreclose Plaintiff's claim. North Dakota enforces both a royalty clause's plain language and its common historical interpretation. Thus, as a matter of law, the Court should dismiss this case.

### BACKGROUND[1]

[¶3]   The Blasi Living Trust ("Plaintiff") is the current Lessor, and Kraken is the current Lessee, of an oil and gas lease entered into on June 22, 2007. Compl. ¶ 9, Ex. 1.

---

[1]   Solely for purposes of this motion, the facts alleged in the complaint are presumed true.

CORE/3520173.0002/160521243.5

[¶4]     The oil and gas lease contains an oil royalty clause, in which the Lessee (Kraken) agrees:

> To deliver to the credit of Lessor [Plaintiff], *free of cost, in the pipeline to which Lessee may connect wells on said land,* the equal one-eighth (1/8) part of all oil produced and saved from the leased premises.

*Id*. at ¶ 10, Ex. 1, ¶ 3 (emphasis added).

[¶5]     Plaintiff does not allege that Kraken charged Plaintiff any portion of the costs to drill the wells and produce the oil to the point where the "wells" may be "connect[ed]" to a "pipeline" "on said land." Instead, Plaintiff implies that Kraken paid Plaintiff royalties based on its "one-eighth (1/8)" share of the oil "free of cost" at that point. *See id*. at ¶¶ 11-12. But, according to Plaintiff, that is not enough.

[¶6]     After producing the oil, Plaintiff alleges that Kraken incurred additional expenses to gather and transport the oil to a faraway, downstream spot where it sells the oil, and that Kraken "improperly deducted from the [faraway, downstream] sales price of the oil various costs such as gathering or moving the oil [off said land] and other costs" to arrive at the value of the oil where the wells could be connected to a pipeline on said land upon which Kraken pays Plaintiff royalties. Plaintiff alleges that this somehow violates the "free of cost" language in the royalty clause. *See id*. at ¶¶ 12-13.

[¶7]     In short, Plaintiff implicitly acknowledges that its royalties are "free of cost, in the pipeline to which the Lessee may connect wells on said land," but nonetheless alleges that its royalties somehow should also be free of cost incurred after or downstream of that point. *See id*. at ¶¶ 11-13.

## RULE 12(b)(6) STANDARD

[¶8]     Rule 12(b)(6) of the Federal Rules of Civil Procedure mandates dismissal if there has been a failure to state a claim upon which relief can be granted. *Berndsen v. North Dakota Univ. Sys.*, 395 F.Supp.3d 1194, 1196 (D.N.D. 2019). In order to survive dismissal, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face.

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The determination of whether a complaint states a claim upon which relief can be granted is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

[¶9] The context of this case is contract interpretation, which is a question of law. *Johnson v. Statoil Oil & Gas LP*, 918 N.W.2d 58, 61 (N.D. 2018) (citations omitted). "'When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone if possible.'" *Bice v. Petro-Hunt, L.L.C.*, 768 N.W.2d 496, 500 (N.D. 2009) (quoting N.D.C.C. § 9-07-04). When unambiguous contract language is dispositive, a case should be resolved by a Rule 12(b)(6) motion and avoid the unnecessary expense of discovery and waste of judicial resources.

## ARGUMENT

[¶10] One basic principle of oil and gas production explains the significance of Plaintiff's claims, namely: The value of oil and gas production increases as it moves away from the wells, downstream to various other locations, ultimately being refined or processed into other products that eventually are consumed by an end-user. *See, e.g.,* David E. Pierce, *The Renaissance of Law in the Law of Oil and Gas: The Contract Dimension,* 42 Washburn L.J. 909, 927 (2004). Oil and gas leases typically establish a fixed royalty percentage; here it is "one-eighth (1/8)." *See* Compl. Ex. 1, ¶ 3. So the initial question is: One-eighth of what? The answer is one-eighth of the value of the oil or gas taken from the ground. Yet, because the value of oil and gas increases as it moves downstream, the point at which the royalty is owed directly affects the amount of the royalty to be paid—the further downstream, the higher the royalty payment.



Figure 1

[¶11]   The dispositive question before the Court is: Where is Plaintiff's royalty percentage to be applied to the oil? Is the answer, (a) Plaintiff is entitled to royalties based on the value of the oil at some undefined, downstream location *or* (b) Plaintiff is entitled to royalties based on the value of the oil free of costs at the point on the leased land where the wells may be connected to a pipeline? Because the plain language of the lease says Plaintiff's royalties are to be "free of cost, in the pipeline to which Lessee may connect wells on said land" (and does not say they are free of any or all costs incurred downstream of that point), as a matter of law Plaintiff is not entitled to the relief it seeks. Thus, Plaintiff has failed to state a claim, and the case should be dismissed.

**I.     The Plain Language of the Royalty Clause Precludes Plaintiff's Claim**

   **A.     Statutory rules of contract construction and interpretation**

[¶12]   The goal of interpreting a contract, which is a question of law, is to ascertain the parties' mutual intent. *National Bank of Harvey v. International Harvester Co.*, 421 N.W.2d 799, 802 (N.D. 1988); N.D.C.C. § 9-07-03. "'When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone if possible.'" *Bice*, 768 N.W.2d at 500 (quoting N.D.C.C.

4

§ 9-07-04). "A contract must be construed as a whole to give effect to each provision if reasonably practicable." *Id.* (citing N.D.C.C. § 9-07-06). "'The words of a contract are to be understood in their ordinary and popular sense rather than according to their strict legal meaning, unless used by the parties in a technical sense, or unless a special meaning is given to them by usage, in which case the latter must be followed.'" *Id.* (quoting N.D.C.C. § 9-07-09). "The language of a contract is to govern its interpretation if the language is clear and explicit and does not involve an absurdity." N.D.C.C. § 9-07-02. "If the language of the contract is clear and unambiguous, and the intent is apparent from its face, there is no room for further interpretation." *Habeck v. MacDonald*, 520 N.W.2d 808, 811 (N.D. 1994); *Kuhn v. Chesapeake Energy Corp.*, No. 1:12–cv–086, 2012 WL 4442798, *4 (D.N.D. Sept. 25, 2012) (oil and gas lease case).

### B. The plain language of the royalty clause means what it says

[¶13]  The unambiguous royalty provision provides:

> To deliver to the credit of Lessor, free of cost, in the pipeline to which Lessee may connect wells on said land, the equal one-eighth (1/8) part of all oil produced and saved from the leased premises.

Compl. ¶¶ 9-10. There is no dispute this clause provides that Kraken is to "deliver to the credit of the Lessor" (Plaintiff) a "one-eighth (1/8)" royalty of "oil produced and saved from the leased premises." Instructively, the only remaining verb in this clause is "connect," and the remaining nouns are: "cost," "pipeline," "Lessee," "wells," and "land."

[¶14]  Focusing on the verb, what does the plain language say is "connect[ed]"—*i.e.*, what noun is connected to what other noun? The answer is, of course, the "pipeline" to the "wells." Where does that "connect[ion]" take place? The plain language says on the "land," specifically "on said land," meaning the land covered by the lease where the wells are located. Common sense demands this conclusion. Wells do not move, so if you connect something to a well (such as a pipeline), it necessarily will be connected where the well is located.

5

[¶15]   Further, under the rules of construction, "free of cost" cannot be read in a vacuum or given a meaning beyond the context created by the other words around it. *See, e.g., Kondrad ex rel. McPhail v. Bismarck Park Dist.*, 655 N.W.2d 411, 413 (N.D. 2003) (contract interpretation must "give meaning to every sentence, phrase, and word"); *Felco, Inc. v. Doug's N. Hill Bottle Shop, Inc.*, 579 N.W.2d 576, 579 (N.D. 1998) (contract interpretation must "give meaning to each word and phrase"). The "free of cost" language is of course modified by the "in the pipeline to which Lessee may connect wells on said land," meaning the oil is free of cost to that point. Contrary to Plaintiff's claim, the language says ***nothing*** about the royalty being free of costs incurred after or downstream of that point. Thus, Kraken is to bear all costs to drill the wells, produce the oil, and deliver it to the point where the wells may be connected to a pipeline on the leased land. At that point, Kraken's contractual obligation to bear cost ends.

>   **C.   The scenario contemplated by the royalty clause illustrates that Plaintiff's claim is contrary to the plain language**

[¶16]   Tellingly, Plaintiff's claim offers no answer to the dispositive question the Court must consider when interpreting this royalty clause, namely: Where is Plaintiff's royalty percentage to be applied to the oil? Plaintiff contends that it is entitled to one-eighth of the value of the oil at some point downstream of the place where the wells may be connected to a pipeline, but Plaintiff does not say where that is or, perhaps more importantly, what language in the royalty clause identifies that downstream point. Why not? Because there is no such language.

[¶17]   The royalty clause itself proves the point. The language says the Lessee "may connect" the pipeline to the "wells on said land." Assume that is exactly what Kraken did, and there was a pipeline connected to each well because, for example, Kraken contracted with an oil-purchasing pipeline company that laid pipe to each well and bought the oil where its pipelines connected to the wells. What royalty would Kraken be responsible for "deliver[ing]" to Plaintiff under this scenario?

6

The answer, of course, is one-eighth of the oil at the point it exited the well and entered the purchasing company's connected pipeline. Would Kraken be allowed to deduct any of the expenses it incurred in drilling the well or producing the oil to that point? Of course not because the royalty clause says the royalty is free of cost to that point. Would Plaintiff be entitled to a royalty based on the value of the oil after it had been transported off of "said land," downstream and far away from the well? Of course not because there is no language in the royalty clause that says anything about providing royalties at any faraway or downstream point.

[¶18]   So, if the Lessee (Kraken) connects the wells to a pipeline, the benefit of the parties' bargain is clear—the Lessor is entitled to royalties based on the value of the oil at that well connection on the leased land. But, the clause says that the Lessee "may" connect the well to the pipeline, not that it "must" do so. What happens if the wells are not connected to a pipeline? If the answer varies from the situation in which the wells are connected, then there must be some specific royalty clause language that justifies the difference because, as described above, changing the point at which Plaintiff's royalty percentage is applied to the oil necessarily changes the value—*i.e.*, it changes the benefit of the parties' bargain. So, what language in the royalty clause signifies that the parties agreed to a different benefit as part of their bargain in this scenario as compared to the scenario in which the wells were connected to a pipeline? The answer is that there is no such language. To impose a different royalty obligation in this scenario would be unfaithful to the plain language of the parties' contract and retroactively change the benefits of their bargain.

[¶19]   Thus, if Kraken "moves" or transports production by truck and/or rail to a distant sales point (*see* Figure 1), the only consistent way to interpret the royalty clause is to have all interests owners proportionately split those additional costs incurred downstream of where the wells could be connected to a pipeline. This is exactly what Plaintiff alleges Kraken did—*i.e.*, again, Kraken is alleged to have complied with the plain language of the royalty clause.

7

### D. North Dakota consistently enforces royalty clause's plain language and the use of deducting post-production costs to arrive at a value at the point where the royalty percentage is to be applied

[¶20]   North Dakota consistently follows the plain language of the parties' royalty clauses in oil and gas leases. *See, e.g., Newfield Exploration Co. v. State ex. rel. North Dakota Bd. of Univ. & Sch. Lands*, 931 N.W.2d 478, 480-81 (N.D. 2019) (plain language of royalty clause stating the royalty was "based on gross production or the market value thereof, at the option of the lessor, such value to be based on gross proceeds of sale where such sale constitutes an arm's length transaction" did not allow any deductions from said "gross proceeds"); *Kittleson v. Grynberg Petroleum Co.*, 876 N.W.2d 443, 445, 447 (N.D. 2016) (the parties' use of "specific 'no deductions' language"—namely, "provided however, that there shall be no deductions from the value of Lessor's royalty of any required processing, cost of dehydration, compression, transportation, or other matter to market such gas"—on its face precluded such deductions); *Bice*, 768 N.W.2d at 501-02 (a royalty clause requiring payment based on the production "at the well" meant what it said and allowed lessee to deduct all downstream, post-production costs to arrive at a value at the well on which it was required to pay royalties).[2]

[¶21]   Sometimes, the oil or gas is sold at the location where the royalty is due, and the sales price provides a value for the production at that point. Often, however, there is no transaction at that location or comparable transactions. In such situations, North Dakota has approved "the use of the work-back [or netback] method to calculate royalties." *Bice*, 768 N.W.2d at 502. As the Supreme Court explained:

> Under the work-back method the lessee calculates the market value of the [oil or] gas at the well "by taking the sales price that it received for its oil or gas production at a downstream point of sale and then subtracting the reasonable

---

[2]   North Dakota regularly enforces the plain language of other oil and gas lease provisions too. *See, e.g., Johnson*, 918 N.W.2d at 61-63; *Fleck v. Missouri River Royalty Corp.*, 872 N.W.2d 329, 335 (N.D. 2015); *Tank v. Citation Oil & Gas Corp.*, 848 N.W.2d 691, 695-96 (N.D. 2014).

8

> post-production costs (including transportation, gathering, compression, processing, treating, and marketing costs) that the lessee incurred after extracting the oil or gas from the ground."

*Id.* at 501 (quoting Byron C. Keeling & Karolyn King Gillespie, *The First Marketable Product Doctrine: Just What is the Product?*, 37 St. Mary's L.J. 1, 51 (2005)); *see also id.* at 502 (noting the Supreme Court has twice approved the State Tax Commissioner's use of the work-back method to value oil and gas production in *Koch Oil Co. v. Hanson*, 536 N.W.2d 702, 707-08 (N.D. 1995) and *Amerada Hess Corp. v. Conrad*, 410 N.W.2d 124, 127 n.3, 130 (N.D. 1987)).[3] As the Court noted, the Eighth Circuit has also validated the work-back approach. *See Bice*, 768 N.W.2d at 502 (citing *Hurinenko v. Chevron, USA, Inc.*, 69 F.3d 283, 285 (8th Cir. 1995)).

[¶22]   Here, Plaintiff alleges Kraken "deducted from the sales price of the oil various costs [incurred after the point where the wells could be connected to a pipeline] such as gathering or moving the oil and other costs" to arrive at the value of the oil upon which Kraken pays Plaintiff royalties. Compl. at ¶ 12. Thus, Plaintiff again alleges that Kraken complied with North Dakota law by utilizing the work-back method to derive the value of oil at the point where the royalty percentage is to be applied under the plain language of the royalty clause.

[¶23]   In short, based on Plaintiff's allegations, Kraken followed North Dakota law in adhering to the plain language of the royalty clause. Thus, as a matter of law, Plaintiff has failed to state a claim for which relief may be granted, and this case should be dismissed. Fed.R.Civ.P. 12(b)(6).

---

[3]   Despite Plaintiff's admission that it does not challenge deductions for severance taxes, which value the oil at the well using the work-back method, Plaintiff incongruously argues that this same production should be valued much differently (and much higher) when calculating its royalties. *See* Compl. ¶ 12 n.1.

9

## II. As this Court Has Recognized, North Dakota Adheres to Prior Interpretations of Standard Form Provisions in Oil and Gas Leases, and Such Interpretations of the Oil Royalty Clause Consistently Preclude Plaintiff's Claim

[¶24] In addition to the statutory rules, there is another applicable, well-established common law rule of contract interpretation, namely: Standard form agreements are to be given consistent interpretation. *Wold v. Zavanna, LLC*, No. 4:12–cv–43, 2013 WL 6858827 (D.N.D. Dec. 31, 2013); *Voshell v. Indian Territory Illuminating Oil Co.*, 19 P.2d 456, 457 (Kan. 1933) (applying this rule of construction to the "familiar producer's form" oil royalty clause to reject a lessor's claim that the lessee was responsible for tank and storage costs downstream of the well connect). In *Wold*, this Court brushed aside the plaintiffs' assertion of an oil and gas lease term, stating:

> Among other things, plaintiffs' argument oversimplifies the process of contract interpretation when dealing with standard form agreements, particularly those replete with language reflecting the judicial gloss of prior court interpretations like the printed-form oil and gas leases at issue here. In construing agreements of this nature, courts frequently rely upon prior judicial constructions of the contract language, particularly when there has been no actual bargaining over the disputed language. Further, this is true even though the parties may not have intended the construction suggested by the existing case law and even though the case law may be in conflict.

2013 WL 6858827 at *10 (citations omitted). This Court went on to explain how the North Dakota Supreme Court in *Bice v. Petro-Hunt* relied on decisions from across the country and the "major treatises on oil and gas law" interpreting similar royalty clause language at issue in that case. *Id.* at *11.[4] Relying on such authority, the Supreme Court held the clause was unambiguous and adopted the plain language interpretation consistent with the majority of other oil and gas jurisdictions. *Bice*, 768 N.W.2d at 500-502.

---

[4] This Court also cited the North Dakota Supreme Court's opinion in *Serhienko v. Kiker*, 392 N.W.2d 808, 812-14 (N.D.1986) as another example. *Wold*, 2013 WL 6858827 at *11; *see also id*. ("Because uniform contracts are interpreted uniformly across cases whenever it is reasonable to do so, extrinsic evidence about what a particular party intended or expected when signing the contract is generally irrelevant." (quoting *Kolbe v. BAC Home Loans Servicing, LP*, 738 F.3d 432 (1st Cir. 2013))).

10

[¶25]   Versions of the standard form oil royalty clause currently at issue have been used in oil and gas leases for over a century. *See, e.g., Kretni Dev. Co. v. Consol. Oil Corp.*, 74 F.2d 497, 500 (10th Cir. 1934) (interpreting a lease signed in 1918). Despite the clause's long history, there have been relatively few challenges to it. However, every leading oil and gas treatise and the overwhelming majority of cases have interpreted this standard form royalty clause as providing a royalty based on the value of the oil at the point where it could flow into a pipeline connected to the well and, therefore, is subject to a proportionate share of costs incurred between that point and a downstream point of sale.

[¶26]   An instructive recent example is *Burlington Res. Oil & Gas Co. LP v. Texas Crude Energy*, LLC, where the Texas Supreme Court considered an overriding royalty interest requiring the royalty to be delivered "into the pipelines, tanks or other receptacles with which the wells may be connected, free and clear of all development, operating, production and other costs" (the "Granting Clause") and, similarly, that the "royalty interest share of production shall be delivered to [the plaintiff] or to its credit into the pipeline, tank or other receptacle to which any well or wells on such lands may be connected, free and clear of all royalties and all other burdens and all costs and expenses except the taxes thereon" (the "Valuation Clause"). 573 S.W.3d 198, 200 (Tex. 2019). The Valuation Clause also defined the value to be paid in relevant part as "(i) in the event of an arm's length sale on the leases, the amount realized from such sale of such production and any products thereof [or] (ii) in the event of an arm's length sale off of the leases, the amount realized for the sale of such production and any products thereof." *Id.* at 202. The plaintiff argued that this "amount realized" language entitled it to a royalty based on a downstream value without deductions. *Id.* So, the plaintiff in *Burlington* had a stronger claim than the Plaintiff in this case because that plaintiff was able to point to specific language suggesting royalties were due on a downstream value. *Id.* at 204-05. The court, however, rejected the plaintiff's claim.

[¶27] Using the same rules of interpretation as are used in North Dakota, the court in *Burlington* held the Granting Clause and Valuation Clause language was unambiguous. And, relying on the language almost identical to the oil royalty clause in this case, the court held the royalty is to be delivered and valued at or near the well, giving the lessee the right to subtract post-production costs from the downstream sale price:

> To sum up, the Valuation Clause specifies that the royalty payment shall be calculated based on the "amount realized" from the sale, but the agreements also provide that the royalty interest shall be delivered "into the pipelines, tanks, or other receptacles with which the wells may be connected." In the context of these agreements, this latter term fixes the royalty's valuation point at the physical spot where the interest must be delivered—at the wellhead or nearby. This gives Burlington the right to subtract post-production costs from the "amount realized" in downstream sales prices in order to calculate the product's value as it flows "into the pipelines, tanks or other receptacles with which the wells may be connected."

*Id.* at 211.

[¶28] Like the long-standing practice of North Dakota state and federal courts,[5] the *Burlington* court relied in part on two leading oil and gas treatises' interpretation of the standard form oil royalty clause language, both of which support dismissal. *See id*. at 207-08. One treatise states that post-production costs must be shared by a nonoperating interest when the parties' lease language is "providing for delivery 'free of cost in the pipe line to which Operator may connect his wells.'" 3 Williams & Meyers, *Oil and Gas Law* § 646.2 (2019). The wording suggests that the parties assumed a pipeline connection at the well would be available, and so the operator does not have the burden of the expense of treating, compressing, or transporting the nonoperator's share of production. *Id*. Similarly, the other treatise states, "If the royalty clause provides for delivery of

---

[5] *See, e.g.*, *Bice*, 768 N.W.2d at 500-502; *Conrad*, 410 N.W.2d at 131-32; *Anderson v. Hess Corp.*, 733 F.Supp.2d 1100, 1106 (D.N.D. 2010); *Egeland v. Continental Res., Inc.*, 616 N.W.2d 861, 866 (N.D. 2000); *Hanson v. Industrial Com'n of North Dakota*, 466 N.W.2d 587, 591, 594 (N.D. 1991); *Holman v. State*, 438 N.W.2d 534, 537-40 (N.D. 1989); *Murphy v. Amoco Production Co.*, 590 F.Supp. 455, 464-65 (D.N.D. 1984); *Knox v. Krueger*, 145 N.W.2d 904, 908 (N.D. 1966).

12

royalty gas to the lessor's credit free of cost in the pipeline to which the well is connected, the parties contemplate a delivery of royalty gas at the well," meaning the royalty is not free of cost incurred downstream of the well. 3 Kuntz, *Law of Oil and Gas* § 40.5(a) (2019).

[¶29]   Similarly, in a not-so-recent example, the Kansas Supreme Court interpreted the same oil royalty clause at issue here and enforced its plain language interpretation as set forth above. *See Molter v. Lewis*, 134 P.2d 404 (Kan. 1943). In *Molter*, the lessee was unable to connect the wells to a pipeline and, thus, incurred costs to truck the oil off the leased land downstream where it could be sold. *Id.* at 405. Exactly like the Plaintiff, the lessor in *Molter* claimed that the oil royalty clause entitled him to royalties based on the downstream sales price without any deduction for his proportionate share of the transportation or post-production costs. *See id.* at 404-05. Applying the plain language of the royalty clause—"deliver to the credit of lessor, free of cost, in the pipe line to which he may connect his wells"—the court rejected the lessor's claim as a matter of law holding: "It is the duty of the lessee to see that the oil is marketed, but this general duty does not mean that the lessee must pay the transportation charge of the lessee's share of the oil from the well to some distant place. His contract is to deliver the oil to the lessor at the well." *Id.* at 404-05, 406. Thus, the "free of cost" language did not require the lessee to bear post-production costs incurred downstream of the well; instead "lessor should pay reasonable charges for such transportation of his share of oil." *Id.* at Syl.

[¶30]   Other courts that have interpreted versions of this standard form royalty clause have consistently held that it requires royalties to be free of cost to the point where a pipeline may connect to the wells on the leased land and to bear a proportionate share of post-production costs incurred downstream of that point. *See, e.g., Kretni Dev.*, 74 F.2d at 500 (where lessee was to deliver gas "to the credit of the lessors . . . free of cost at the pipe lines, to which he may connect his wells," lessors were entitled to royalty at the well connection with the pipeline; lessor's claim was unreasonable in

13

part because the "cost of transportation might equal or exceed the value of the gas in the field"); *Voshell*, 19 P.2d at 458 (where lessee was required to deliver oil "to the credit of lessor, free of cost, in the pipe line to which he may connect his wells," lessor was entitled to royalty based on the downstream sale price minus transportation costs); *Scott v. Steinberger*, 213 P. 646, 647 (Kan. 1923) (where lessee "shall deliver to the credit of the party of the first part free of cost in the pipe lines to which he may connect his wells," lessor's royalty was to be determined "at the place where the wells were connected with pipe lines, and not at some distant market that might be found at the end of a pipe line remote from the field").

[¶31]   The historical interpretation of this standard form royalty clause, like the plain language of the clause itself, precludes Plaintiff's claim as a matter of law and is yet another reason the complaint should be dismissed. *See Wold*, 2013 WL 6858827 at *10-11.

### III.   Of this Court's Two Recent Cases Involving this Standard Form Royalty Clause, the First One Supports Dismissal, But Neither Is Directly On Point

[¶32]   This Court has recently decided two cases involving this royalty clause. The first case, *El Petron Enterprises, LLC v. Whiting Resources Corp.*, involved an overriding royalty claim. No. 1:16-cv-90, 2018 WL 1322391, *1 (D.N.D. Mar. 14, 2018). This case is instructive because Judge Hovland ruled that the controlling language in the Reservation (the document creating the overriding royalty interest) was that the overriding royalty interest "shall be calculated in the same manner as the royalty reserved under the terms of the Leases"—*i.e.*, the royalty clauses in the leases, including the same oil royalty clause at issue in this case, were controlling. *Id.* at *3, 5. Judge Hovland then ruled that, under all of those royalty clauses, the royalties were due on the production at or near the well and allowed the lessee to use the work-back method to deduct post-production costs from a downstream sales price to derive the value of the production on which it was to pay the royalties. *Id.* at *4-5. Thus, although this case involved an overriding royalty interest and gas

14

royalties, it unmistakably also involved oil royalties under the same clause presently at issue and construed the royalty clause in a manner that precludes Plaintiff's claim.

[¶33]   While supporting dismissal, *El Petron* is perhaps not controlling because the plaintiff's argument focused on the "free and clear of all costs" language in the Reservation as opposed to the "free of cost" language of the royalty clause in the lease. *See id.* at *4-5. Nevertheless, Judge Hovland rejected the plaintiff's claim and, instead, interpreted that Reservation language as precluding the deduction of "production costs or administrative fees" but allowing deduction of post-production costs. *Id.* at *5. Consequently, this Court held the Reservation language had the same meaning as the similar language contained in the oil royalty clause, which meaning would (and should) preclude Plaintiff's claim in this case.

[¶34]   In the second case—*White River Royalties, LLC v. Hess Bakken Investments II, LLC*—Judge Traynor found that the parties agreed that there was no pipeline connected to any of the wells. No. 1:19-cv-218, slip op. at 3, n.3 (D.N.D. May 22, 2020). Here, Kraken has made no such stipulation, and, as explained above, Kraken's royalty obligation is unambiguous when the wells are connected to a pipeline and such royalty obligation precludes Plaintiff's claim. *See supra* Part I.C. Also, the *White River* opinion did not interpret the standard form royalty provision under the corresponding common law cannon of construction used by this Court in *Wold*, which minimized the importance of the common historical interpretations of the royalty clause from other jurisdictions and leading oil and gas treatises. *See supra* Part II; *White River*, slip op. at 6. Finally, Judge Traynor found that the parties' conflicting interpretations of the royalty clause were both plausible and thus denied a motion to dismiss. However, there is no explanation how the plaintiff's interpretation that focused exclusively on the phrase "free of cost, in the pipeline" accounts for (or under the rules of construction, gives meaning to) the rest of that phrase—namely, "to which Lessee may connect wells on said land." *Id.* at 9, 12. Judge Traynor expressly noted that he had not found

15

the royalty clause was ambiguous, thereby preserving the court's ability to later find it to be unambiguous and potentially dispose of the claim as a matter of law.[6] *Id.* at 12, n.6.

[¶35] Thus, while the first of the opinions from this Court involving the oil royalty clause at issue supports dismissal, neither of them is directly controlling. Importantly, however, neither suggests that the plain language of the royalty clause should not be enforced in a manner that gives meaning to every word, or that the historical interpretation of the standard form royalty clause adopted by courts and commentators alike should not be followed.

## CONCLUSION

[¶36] The plain language of the oil royalty clause at issue entitles Plaintiff to royalty free of cost at the point where the wells may be connected to a pipeline on the leased land. This is also the common historical interpretation of the clause and how it had been implemented and utilized for the last 100 years. Because North Dakota adheres to the plain language and this Court recognizes the appropriateness of adhering to historical interpretations of standard form provisions in oil and gas leases, this Court should find Plaintiff has failed to state a claim and dismiss this case.

---

[6] Kraken respectfully requests a determination on whether the royalty clause is ambiguous. If the clause is ambiguous, judicial economy would be best served if the ambiguity is identified so as to give the parties direction on the discovery necessary to advance this case. If the royalty clause is unambiguous, the motion should be decided based on the plain language.

Dated:  July 22, 2020

| | |
|---|---|
| /s/ *Robin Wade Forward* | /s/ *Matthew J. Salzman* |
| Robin Wade Forward (ND Bar 05324) | Matthew J. Salzman |
| **STINSON LLP** | **STINSON LLP** |
| 811 East Interstate Avenue | 1201 Walnut Street, Suite 2900 |
| Bismarck, ND  58503 | Kansas City, MO  64106 |
| Telephone:  (701) 221-8600 | Telephone:  (816) 691-2495 |
| rob.forward@stinson.com | matt.salzman@stinson.com |

/s/ Paul J. Forster
Paul J. Forster (ND ID #07398)
pforster@crowleyfleck.com
Zachary R. Eiken (ND ID #07832)
zeiken@crowleyfleck.com
**CROWLEY FLECK PLLP**
100 West Broadway Ave., Suite 250
P.O. Box 2798
Bismarck, ND  58502-2798
Telephone: (701) 223-6585

17